**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **RICHARD THOMAS**, individually on behalf of himself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>**TRANSUNION, LLC**,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Richard Thomas ("Plaintiff"), through their attorneys, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant TransUnion, LLC ("TransUnion" or "Defendant"), and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, and/or other related entities. Plaintiff alleges the following on information and belief—except as to their own actions, counsel's investigations, and facts of public record.

## NATURE OF ACTION

1. This class action arises from Defendant's failure to protect highly sensitive data.

2. TransUnion is a global credit reporting agency with an estimated annual revenue of $4.2 billion.[1]

3. As such, Defendant stores a litany of highly sensitive personal identifiable information ("PII") about its current and former clients. But Defendant lost control over that data when cybercriminals infiltrated its insufficiently protected computer systems in a data breach (the "Data Breach").

[1] https://www.linkedin.com/company/transunion/ (last visited September 2, 2025).

4. According to a letter sent to Data Breach victims (referred to herein as the "Breach Notice"),[2] Defendant "experienced a cyber incident involving a third-party application serving our U.S. consumer support operations" which resulted in unauthorized access to personal information belonging to current and former clients.

5. According to the notification Defendant provided to the Attorney General of Maine, the Data Breach began on July 28, 2025, and was not discovered until two days later on July 30, 2025. Additionally, the Data Breach impacted at least 4,461,511 individuals.[3]

6. In other words, Defendant had no effective means to prevent, detect, stop, or mitigate breaches of its systems—thereby allowing cybercriminals unfettered access to steal millions of its current and former clients' PII.

7. On information and belief, cybercriminals were able to breach Defendant's systems because Defendant failed to adequately train its employees on cybersecurity and failed to maintain reasonable security safeguards or protocols to protect the Class's PII. In short, Defendant's failures placed the Class's PII in a vulnerable position—rendering them easy targets for cybercriminals.

8. Plaintiff is a Data Breach victim. He brings this class action on behalf of themselves, and all others harmed by Defendant's misconduct.

9. The exposure of one's PII to cybercriminals is a bell that cannot be unrung. Before this data breach, TransUnion's clients' private information was exactly that—private. Not anymore. Now, their private information is forever exposed and unsecure.

**PARTIES**

10. Plaintiff, Richard Thomas, is a natural person and a resident of the State of Missouri, where he intends to remain.

---

[2] The Breach Notice TransUnion sent to impacted individuals is attached hereto as Exhibit A.

[3] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited September 2, 2025).

11. Defendant, TransUnion, LLC, is a company with its principal place of business at 555 West Adams, Chicago, Illinois 60661.

**JURISDICTION AND VENUE**

12. This Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Plaintiff and Defendant are citizens of different states. And there are over 100 putative Class Members.

13. This Court has personal jurisdiction over Defendant because it is headquartered in Illinois, regularly conducts business in Illinois, and has sufficient minimum contacts in Illinois.

14. Venue is proper in this Court because Defendant's principal office is in this District, and because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

**BACKGROUND**

***TransUnion Collected and Stored the PII of Plaintiff and the Class***

15. Defendant is a global "information and insights company" that boasted an annual revenue of $4.2 billion in 2024.[4] As part of its business, Defendant receives and maintains the PII of millions of its current and former clients.

16. In collecting and maintaining the PII, Defendant agreed it would safeguard the data in accordance with its internal policies, state law, and federal law. After all, Plaintiff and Class Members themselves took reasonable steps to secure their PII.

17. Under state and federal law, businesses like Defendant have duties to protect the PII in its custody and to notify owners of said PII about data breaches.

18. Defendant recognizes these duties, promising in its "Privacy Policy" that "[w]e

[4] https://www.linkedin.com/company/transunion/ (last visited September 2, 2025).

maintain a comprehensive information security program with administrative (policies, standards, and processes), physical, and technical controls designed to protect the confidentiality, integrity, and accessibility of personal information."[5]

***TransUnion's Data Breach***

19. TransUnion reported to the Attorney General of Maine that it had experienced a cyber incident on July 28, 2025, that it did not discover until two days later on July 30, 2025.[6] The Data Breach involved "unauthorized access… to personal data that was stored on a third-party application."[7]

20. In other words, Defendant's cyber and data security systems were so completely inadequate that it allowed cybercriminals to obtain files containing a treasure trove of thousands of its clients highly private PII for multiple days.

21. TransUnion has not disclosed the specific data types that were exposed in the Data Breach, but according to its Notification to the Attorney General of Maine, the breach impacted at least 4,461,511 individuals."[8]

22. On or around August 25, 2025—a month after the Data Breach occurred—TransUnion began notifying impacted individuals.

23. When Defendant did notify the Plaintiff and the Class of the Data Breach, Defendant acknowledged that the Data Breach created a present, continuing, and significant risk of identity theft, providing Plaintiff and the Class with credit monitoring and "proactive fraud

---

[5] TransUnion LLC Privacy Notice, TransUnion, https://www.transunion.com/privacy/transunion (last visited September 2, 2025).

[6] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited August 28, 2025).

[7] Ex. A.

[8] https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/3dcd9b7c-bce3-4685-bffd-f728ce96e2fd.html (last visited August 28, 2025).

assistance" services.[9]

24. Even with several months' worth of credit monitoring services, the risk of identity theft and unauthorized use of Plaintiff and Class Members' PII is still substantially high. The fraudulent activity resulting from the Data Breach may not come to light for years.

25. Due to the obfuscating language in TransUnion's Breach Notice, it is unclear when the Data Breach occurred, how long cybercriminals had access to client PII, and how the Data Breach occurred.

26. Defendant failed its duties when its inadequate security practices caused the Data Breach. In other words, Defendant's negligence is evidenced by its failure to prevent the Data Breach and stop cybercriminals from stealing PII it its care. And thus, Defendant caused widespread injury and monetary damages.

27. Worryingly, this incident is only part and parcel of Defendant's pattern of negligent data security. Just three years ago, in August 2022, TransUnion sent a Notice of Security Incident regarding a data breach that impacted customers' personal data.[10]

28. This previous incident further evidences Defendant's lack of adequate cybersecurity measures.

29. Since the Data Breach, Defendant claims that it will "continue to enhance our security controls as appropriate to minimize the risk of any similar incident in the future."[11]

30. But such simple declarations are insufficient to ensure that the Plaintiff and Class Members' PII will be protected from additional exposure in a subsequent data breach. Indeed, such

---

[9] Ex. A.
[10] 2022 Notice of Security Incident, TransUnion, chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://www.mass.gov/doc/assigned-data-breach- number-28019-transunion-llc/download (last visited June 29, 2025).
[11] Ex. A.

steps to "minimize risk" should have been in place *before* the Data Breach.

31. TransUnion has done little to remedy its Data Breach. True, Defendant has offered some victims credit monitoring and identity related services. But upon information and belief, such services are wholly insufficient to compensate the Plaintiff and Class Members for the injuries that Defendant inflicted upon them.

32. Because of TransUnion's Data Breach, the sensitive PII of the Plaintiff and Class Members was placed into the hands of cybercriminals—inflicting numerous injuries and significant damages upon the Plaintiff and Class Members.

33. Ransomware groups can monetize stolen PII and sell it on the dark web as part of a full identity profile.[12] Buyers can then use that information to conduct different types of identity theft or fraud, such as filing a fake tax return, applying for a fraudulent mortgage or opening a bank account while impersonating the victim.[13]

34. And as the Harvard Business Review notes, such "[c]ybercriminals frequently use the Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to through credential stuffing attacks, phishing attacks, [or] hacking."[14]

***Plaintiff Richard Thomas's Experiences and Injuries***

35. On information and belief, Plaintiff Richard Thomas has been a customer of TransUnion for many years. He has used TransUnion to pull his credit report in a number of personal business transactions.

[12] Anthony M. Freed, *Which Data Do Ransomware Attackers Target for Double Extortion?*, MALICIOUSLIFE BY CYBEREASON, https://www.cybereason.com/blog/which-data-do-ransomware-attackers-target-for-double-extortion (listed visited Mar. 6, 2025).
[13] *Id.*
[14] Brenda R. Sharton, *Your Company's Data Is for Sale on the Dark Web. Should You Buy It Back?*, HARVARD BUS. REV. (Jan. 4, 2023) https://hbr.org/2023/01/your-companys-data-is-for- sale-on-the-dark-web-should-you-buy-it-back.

36. Through this association, TransUnion obtained and maintained Plaintiff's PII which was then disclosed without Plaintiff's permission.

37. As a result, Plaintiff was injured by Defendant's Data Breach.

38. Plaintiff is very careful about the privacy and security of his PII. He does not knowingly transmit his PII over the internet in an unsafe manner. Plaintiff is careful to store any documents containing his PII in a secure location.

39. Plaintiff provided his PII to Defendant and trusted the company would use reasonable measures to protect it according to TransUnion's internal policies, as well as state and federal law. Defendant obtained and continues to maintain Plaintiff's PII and has a continuing legal duty and obligation to protect that PII from unauthorized access and disclosure.

40. Plaintiff reasonably understood that a portion of the funds paid to Defendant would be used to pay for adequate cybersecurity and protection of PII.

41. Thus, on information and belief, Plaintiff's PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

42. Through its Data Breach, Defendant compromised Plaintiff's PII.

43. Plaintiff has spent—and will continue to spend—significant time and effort monitoring his accounts to protect himself from identity theft. After all, Defendant directed Plaintiff to take those steps in its breach notice.

44. Plaintiff fears for his personal financial security and worries about what information was exposed in the Data Breach.

45. Because of Defendant's Data Breach, Plaintiff has suffered—and will continue to suffer from—anxiety, sleep disruption, stress, fear, and frustration. Such injuries go far beyond allegations of mere worry or inconvenience. Rather, Plaintiff's injuries are precisely the type of

injuries that the law contemplates and addresses.

46. Plaintiff suffered actual injury from the exposure, theft, and dissemination of his PII on the dark web—which violates his rights to privacy.

47. Plaintiff suffered actual injury in the form of damages to and diminution in the value of his PII. After all, PII is a form of intangible property—property that Defendant was required to adequately protect.

48. Plaintiff suffered imminent and impending injury arising from the substantially increased risk of fraud, misuse, and identity theft—all because Defendant's Data Breach placed Plaintiff's PII right in the hands of criminals.

49. Because of the Data Breach, Plaintiff anticipates spending considerable amounts of time and money to try and mitigate his injuries.

50. Today, Plaintiff has a continuing interest in ensuring that his PII—which, upon information and belief, remains backed up in Defendant's possession—is protected and safeguarded from additional breaches.

***Consumers Prioritize Data Security***

51. In 2024, the technology and communications conglomerate Cisco published the results of its multi-year "Consumer Privacy Survey."[15] Therein, Cisco reported the following:

a. "For the past six years, Cisco has been tracking consumer trends across the privacy landscape. During this period, privacy has evolved from relative obscurity to a customer requirement with more than 75% of consumer respondents saying they won't purchase from an organization they don't

---

[15] *Privacy Awareness: Consumers Taking Charge to Protect Personal*, CISCO, https://www.cisco.com/c/dam/en_us/about/doing_business/trust-center/docs/cisco-consumer- privacy-report-2024.pdf (last visited March 19, 2025).

trust with their data."[16]

b. "Privacy has become a critical element and enabler of customer trust, with 94% of organizations saying their customers would not buy from them if they did not protect data properly."[17]

c. 89% of consumers stated that "I care about data privacy."[18]

d. 83% of consumers declared that "I am willing to spend time and money to protect data" and that "I expect to pay more" for privacy.[19]

e. 51% of consumers revealed that "I have switched companies or providers over their data policies or data-sharing practices."[20]

f. 75% of consumers stated that "I will not purchase from organizations I don't trust with my data."[21]

***Plaintiff and the Proposed Class Face Significant Risk of Continued Identity Theft***

52. Because of Defendant's failure to prevent the Data Breach, Plaintiff and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, lost time, anxiety, and emotional distress. Also, they suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their PII is used;

b. diminution in value of their PII;

c. compromise and continuing publication of their PII;

d. out-of-pocket costs from trying to prevent, detect, and recovery from

[16] *Id*. at 3.
[17] *Id*.
[18] *Id*. at 9.
[19] *Id*.
[20] *Id*.
[21] *Id*. at 11.

identity theft and fraud;

e. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

f. delay in receipt of tax refund monies;

g. unauthorized use of their stolen PII; and

h. continued risk to their PII—which remains in Defendant's possession—and is thus as risk for futures breaches so long as Defendant fails to take appropriate measures to protect the PII.

53. Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.

54. The value of the Plaintiff and Class's PII on the black market is considerable. Stolen PII trades on the black market for years. And criminals frequently post and sell stolen information openly and directly on the "Dark Web"—further exposing the information.

55. It can take victims years to discover such identity theft and fraud. This gives criminals plenty of time to sell the PII far and wide.

56. One way that criminals profit from stolen PII is by creating comprehensive dossiers on individuals called "Fullz" packages. These dossiers are both shockingly accurate and comprehensive. Criminals create them by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.).

57. The development of "Fullz" packages means that the PII exposed in the Data Breach can easily be linked to data of the Plaintiff and the Class that is available on the internet.

58. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to the Plaintiff and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff and other Class Members' stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

59. Defendant disclosed the PII of the Plaintiff and Class Members for criminals to use in the conduct of criminal activity. Specifically, Defendant opened up, disclosed, and exposed the PII of the Plaintiff and Class Members to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

60. Defendant's failure to promptly and properly notify the Plaintiff and Class Members of the Data Breach exacerbated the Plaintiff and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant Knew—Or Should Have Known—of the Risk of a Data Breach***

61. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in recent years.

62. In 2021, a record 1,862 data breaches occurred, exposing approximately 293,927,708 sensitive records—a 68% increase from 2020.[22]

---

[22] *See 2021 Data Breach Annual Report*, IDENTITY THEFT RESOURCE CENTER (Jan. 2022) https://notified.idtheftcenter.org/s/.

63. Indeed, cyberattacks have become so notorious that the Federal Bureau of Investigation's ("FBI") 2024 Internet Crime Report details that reported losses from internet crime exceeded $16 billion in 2024 – a 33% increase from the prior year. [23]

64. According to the *2023 Annual Data Breach Report*, the number of data compromises in 2023 nearly doubled compared to 2022.[24] And in 2023, a record 3,205 breaches occurred, exposing the data of approximately 353,027,892 victims.[25]

65. And, in 2024, there were 3,158 data breaches with 1,350,835,988 victim notices, a 211% increase year over year.[26]

66. Cyberattacks have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service issue warnings to potential targets, so they are aware of, and prepared for, a potential attack.[27]

67. Therefore, the increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendant's industry, including Defendant.

***Defendant Failed to Follow FTC Guidelines***

68. According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making. Thus, the FTC issued numerous guidelines identifying best data security practices that businesses—like Defendant—should use to protect against unlawful data exposure.

---

[23] FBI National Press Office, *FBI Releases Annual Internet Crime Report,* (Apr. 23, 2025), https://www.fbi.gov/news/press-releases/fbi-releases-annual-internet-crime-report.

[24] https://www.idtheftcenter.org/post/2023-annual-data-breach-report-reveals-record-number-of-compromises-72-percent-increase-over-previous-high/ (last visited August 13, 2025).

[25] *Id.*

[26] *2024 Data Breach Report* at 6, Identity Theft Resource Center (Jan.2025), https://www.idtheftcenter.org/wpcontent/uploads/2025/02/ITRC_2024DataBreachReport.pdf (last visited August 12, 2025).

[27] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted- ransomware.

69. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*. There, the FTC set guidelines for what data security principles and practices businesses must use.[28] The FTC declared that, *inter alia*, businesses must:

a. protect the personal customer information that they keep;

b. properly dispose of personal information that is no longer needed;

c. encrypt information stored on computer networks;

d. understand their network's vulnerabilities; and

e. implement policies to correct security problems.

70. The guidelines also recommend that businesses watch for the transmission of large amounts of data out of the system—and then have a response plan ready for such a breach.

71. Furthermore, the FTC explains that companies must:

a. not maintain information longer than is needed to authorize a transaction;

b. limit access to sensitive data;

c. require complex passwords to be used on networks;

d. use industry-tested methods for security;

e. monitor for suspicious activity on the network; and

f. verify that third-party service providers use reasonable security measures.

72. The FTC brings enforcement actions against businesses for failing to protect

[28] *Protecting Personal Information: A Guide for Business,* FED TRADE COMMISSION (Oct. 2016) https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.

customer data adequately and reasonably. Thus, the FTC treats the failure—to use reasonable and appropriate measures to protect against unauthorized access to confidential consumer data—as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

73. In short, Defendant's failure to use reasonable and appropriate measures to protect against unauthorized access to its current and former clients and/or consumers' data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Defendant Failed to Follow Industry Standards***

74. Several best practices have been identified that—at a *minimum*—should be implemented by businesses like Defendant. These industry standards include: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption (making data unreadable without a key); multi-factor authentication; backup data; and limiting which employees can access sensitive data.

75. Other industry standard best practices include: installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

76. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04)

and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

77. These frameworks are applicable and accepted industry standards. And by failing to comply with these accepted standards, Defendant opened the door to the criminals—thereby causing the Data Breach.

**CLASS ACTION ALLEGATIONS**

78. Plaintiff brings this class action under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3), individually and on behalf of all members of the following class:

> All individuals residing in the United States whose PII was compromised in the Data Breach announced by Defendant in August 2025, including all those individuals who received notice of the breach.

79. Excluded from the Class are Defendant, its agents, affiliates, parents, subsidiaries, any entity in which Defendant has a controlling interest, any Defendant officer or director, any successor or assign, and any Judge who adjudicates this case, including their staff and immediate family.

80. Plaintiff reserves the right to amend the class definition.

81. Certification of Plaintiffs' claims for class-wide treatment is appropriate because the Plaintiff can prove the elements of their claims on class-wide bases using the same evidence as would be used to prove those elements in individual actions asserting the same claims.

82. <u>Ascertainability</u>. All members of the proposed Class are readily ascertainable from information in Defendant's custody and control. After all, Defendant already identified some individuals and sent them data breach notices.

83. Numerosity. The Class Members are so numerous that joinder of all Class Members is impracticable. Upon information and belief, the proposed Class includes 4,461,511 individuals.

84. Typicality. Plaintiffs' claims are typical of Class Members' claims as each arises from the same Data Breach, the same alleged violations by Defendant, and the same unreasonable manner of notifying individuals about the Data Breach.

85. Adequacy. Plaintiff will fairly and adequately protect the proposed Class's common interests. Their interests do not conflict with Class Members' interests. And Plaintiff has retained counsel—including lead counsel—that is experienced in complex class action litigation and data privacy to prosecute this action on the Class's behalf.

86. Commonality and Predominance. Plaintiffs' and the Class's claims raise predominantly common fact and legal questions—which predominate over any questions affecting individual Class Members—for which a class wide proceeding can answer for all Class Members. In fact, a class wide proceeding is necessary to answer the following questions:

a. if Defendant had a duty to use reasonable care in safeguarding Plaintiffs' and the Class's PII;

b. if Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. if Defendant was negligent in maintaining, protecting, and securing PII;

d. if Defendant breached contract promises to safeguard the Plaintiff and the Class's PII;

e. if Defendant took reasonable measures to determine the extent of the Data Breach after discovering it;

f. if Defendant's Breach Notice was reasonable;

g. if the Data Breach caused the Plaintiff and the Class injuries;

h. what the proper damages measure is; and

i. if the Plaintiff and the Class are entitled to damages, treble damages, and or injunctive relief.

87. Superiority. A class action will provide substantial benefits and is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that individual litigation against Defendant would require. Thus, it would be practically impossible for Class Members, on an individual basis, to obtain effective redress for their injuries. Not only would individualized litigation increase the delay and expense to all parties and the courts, but individualized litigation would also create the danger of inconsistent or contradictory judgments arising from the same set of facts. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, ensures economies of scale, provides comprehensive supervision by a single court, and presents no unusual management difficulties.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On Behalf of Plaintiff and the Class)**

88. Plaintiff incorporates by reference all other paragraphs as if fully set forth herein.

89. Plaintiff and the Class entrusted their PII to Defendant on the premise and with the understanding that Defendant would safeguard their PII, use their PII for business purposes only, and/or not disclose their PII to unauthorized third parties.

90. Defendant owed a duty of care to Plaintiff and Class Members because it was foreseeable that Defendant's failure—to use adequate data security in accordance with industry standards for data security—would compromise their PII in a data breach. And here, that

foreseeable danger came to pass.

91. Defendant has full knowledge of the sensitivity of the PII and the types of harm that the Plaintiff and the Class could and would suffer if their PII was wrongfully disclosed.

92. Defendant owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's inadequate security practices. After all, Defendant actively sought and obtained Plaintiffs' and Class Members' PII.

93. Defendant owed—to Plaintiff and Class Members—at least the following duties to:

a. exercise reasonable care in handling and using the PII in its care and custody;

b. implement industry-standard security procedures sufficient to reasonably protect the information from a data breach, theft, and unauthorized;

c. promptly detect attempts at unauthorized access;

d. notify Plaintiff and Class Members within a reasonable timeframe of any breach to the security of their PII.

94. Thus, Defendant owed a duty to timely and accurately disclose to Plaintiff and Class Members the scope, nature, and occurrence of the Data Breach. After all, this duty is required and necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps to mitigate the harm caused by the Data Breach.

95. Defendant also had a duty to exercise appropriate clearinghouse practices to remove PII it was no longer required to retain under applicable regulations.

96. Defendant knew or reasonably should have known that the failure to exercise due care in the collecting, storing, and using of the PII of Plaintiff and the Class involved an unreasonable risk of harm to Plaintiff and the Class, even if the harm occurred through the criminal acts of a third party.

97. Defendant's duty to use reasonable security measures arose because of the special relationship that existed between Defendant and Plaintiff and the Class. That special relationship arose because Plaintiff and the Class entrusted Defendant with their confidential PII, a necessary part of obtaining services from Defendant.

98. The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Defendant hold vast amounts of PII, it was inevitable that unauthorized individuals would attempt to access Defendant's databases containing the PII — whether by malware or otherwise.

99. PII is highly valuable, and Defendant knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members' and the importance of exercising reasonable care in handling it.

100. Defendant improperly and inadequately safeguarded the PII of Plaintiff and the Class in deviation of standard industry rules, regulations, and practices at the time of the Data Breach.

101. Defendant breached these duties as evidenced by the Data Breach.

102. Defendant acted with wanton and reckless disregard for the security and confidentiality of Plaintiffs' and Class Members' PII by:

a. disclosing and providing access to this information to third parties and

b. failing to properly supervise both the way the PII was stored, used, and exchanged, and those in its employ who were responsible for making that

happen.

103. Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, and in handling and securing the personal information and PII of Plaintiff and Class Members which actually and proximately caused the Data Breach and Plaintiff and Class Members' injury.

104. Defendant further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and Class Members, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff and Class Members' injuries-in-fact.

105. Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons because of the Data Breach.

106. As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiff and Class Members have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

107. And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently by cybercriminals on the dark web.

108. Under the FTC Act, 15 U.S.C. § 45, Defendant had a duty to use fair and adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' PII.

109. Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect the PII entrusted to it. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Defendant's duty to protect Plaintiff and the Class Members' sensitive PII.

110. Defendant breached its respective duties to Plaintiff and Class Members under the

FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard PII.

111. Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII Defendant had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to individuals in the event of a breach, which ultimately came to pass.

112. The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

113. Defendant's breach of its common-law duties to exercise reasonable care and its failures and negligence actually and proximately caused Plaintiff and Class Members actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendant's negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## SECOND CAUSE OF ACTION
**Breach of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

114. Plaintiff incorporate by reference all other paragraphs as if fully set forth herein.

115. Plaintiff and Class Members either directly contracted with Defendant or Plaintiff and Class Members were the third-party beneficiaries of contracts with Defendant.

116. Plaintiff and Class Members were required to provide their PII to Defendant as a condition of receiving services provided by Defendant. Plaintiff and Class Members provided their PII to Defendant in exchange for Defendant's services.

117. Plaintiff and Class Members reasonably understood that a portion of the funds they paid would be used to pay for adequate cybersecurity measures.

118. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

119. Plaintiff and the Class Members accepted Defendant's offers by disclosing their PII to Defendant in exchange for services.

120. In turn, and through internal policies, Defendant agreed to protect and not disclose the PII to unauthorized persons.

121. In its Privacy Policy, Defendant represented that they had a legal duty to protect Plaintiffs' and Class Member's PII.

122. Implicit in the parties' agreement was that Defendant would provide Plaintiff and Class Members with prompt and adequate notice of all unauthorized access and/or theft of their PII.

123. After all, Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of such an agreement with Defendant.

124. Plaintiff and the Class fully performed their obligations under the implied contracts with Defendant.

125. The covenant of good faith and fair dealing is an element of every contract. Thus, parties must act with honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties

according to their terms, means preserving the spirit—and not merely the letter—of the bargain. In short, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

126. Subterfuge and evasion violate the duty of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or consist of inaction. And fair dealing may require more than honesty.

127. Defendant materially breached the contracts it entered with Plaintiff and Class Members by:

a. failing to safeguard their information;

b. failing to notify them promptly of the intrusion into its computer systems that compromised such information.

c. failing to comply with industry standards;

d. failing to comply with the legal obligations necessarily incorporated into the agreements; and

e. failing to ensure the confidentiality and integrity of the electronic PII that Defendant created, received, maintained, and transmitted.

128. In these and other ways, Defendant violated its duty of good faith and fair dealing.

129. Defendant's material breaches were the direct and proximate cause of Plaintiffs' and Class Members' injuries (as detailed *supra*).

130. And, on information and belief, Plaintiffs' PII has already been published—or will be published imminently—by cybercriminals on the Dark Web.

131. Plaintiff and Class Members performed as required under the relevant agreements, or such performance was waived by Defendant's conduct.

**THIRD CAUSE OF ACTION**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

132. Plaintiff incorporate by reference all other paragraphs as if fully set forth herein.

133. This claim is pleaded in the alternative to the breach of implied contract claim.

134. Plaintiff and Class Members conferred a benefit upon Defendant. After all, Defendant benefitted from (1) using their PII to provide services, and (2) accepting payment.

135. Defendant appreciated or had knowledge of the benefits it received from Plaintiff and Class Members.

136. Plaintiff and Class Members reasonably understood that Defendant would use adequate cybersecurity measures to protect the PII that they were required to provide based on Defendant's duties under state and federal law and its internal policies.

137. Defendant enriched itself by saving the costs they reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' PII.

138. Instead of providing a reasonable level of security, or retention policies, that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendant's failure to provide the requisite security.

139. Under principles of equity and good conscience, Defendant should not be permitted to retain the full value of Plaintiffs' and Class Members' (1) PII and (2) payment because Defendant failed to adequately protect their PII.

140. Plaintiff and Class Members have no adequate remedy at law.

141. Defendant should be compelled to disgorge into a common fund—for the benefit

of Plaintiff and Class Members—all unlawful or inequitable proceeds that it received because of its misconduct.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On Behalf of Plaintiff and the Class)**

142. Plaintiff incorporate by reference all other paragraphs as if fully set forth herein.

143. Given the relationship between Defendant and Plaintiff and Class Members, where Defendant became guardian of Plaintiffs' and Class Members' PII, Defendant became a fiduciary by its undertaking and guardianship of the PII, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff and Class Members' PII; (2) to timely notify Plaintiff and Class Members of a Data Breach and disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendant did and does store.

144. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendant's relationship with them—especially to secure their PII.

145. Because of the highly sensitive nature of the PII, Plaintiff and Class Members would not have entrusted Defendant, or anyone in Defendant's position, to retain their PII had they known the reality of Defendant's inadequate data security practices.

146. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to sufficiently encrypt or otherwise protect Plaintiffs' and Class Members' PII.

147. Defendant also breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give notice of the Data Breach in a reasonable and practicable period.

148. As a direct and proximate result of Defendant's breach of its fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer numerous injuries (as

detailed *supra*).

**<u>FIFTH CAUSE OF ACTION</u>**
**Declaratory Judgment**
**(On Behalf of Plaintiff and the Class)**

149. Plaintiff incorporate by reference all other paragraphs as if fully set forth herein.

150. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. The Court has broad authority to restrain acts, such as those alleged herein, which are tortious and unlawful.

151. In the fallout of the Data Breach, an actual controversy has arisen about Defendant's various duties to use reasonable data security. On information and belief, Plaintiff allege that Defendant's actions were—and *still* are—inadequate and unreasonable. And Plaintiff and Class Members continue to suffer injury from the ongoing threat of fraud and identity theft.

152. Given its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

a. Defendant owed—and continues to owe—a legal duty to use reasonable data security to secure the data entrusted to it;

b. Defendant has a duty to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTC Act;

c. Defendant breached, and continues to breach, its duties by failing to use reasonable measures to the data entrusted to it; and

d. Defendant breaches of its duties caused—and continues to cause—injuries to Plaintiff and Class Members.

153. The Court should also issue corresponding injunctive relief requiring Defendant to use adequate security consistent with industry standards to protect the data entrusted to it.

154. If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy if Defendant experiences a second data breach.

155. And if a second breach occurs, Plaintiff and the Class will lack an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages—while warranted for out-of-pocket damages and other legally quantifiable and provable damages—cannot cover the full extent of Plaintiff and Class Members' injuries.

156. If an injunction is not issued, the resulting hardship to Plaintiff and Class Members far exceeds the minimal hardship that Defendant could experience if an injunction is issued.

157. An injunction would benefit the public by preventing another data breach—thus preventing further injuries to Plaintiff, Class Members, and the public at large.

## PRAYER FOR RELIEF

Plaintiff and Class Members respectfully request judgment against Defendant and that the Court enter an order:

A. Certifying this case as a class action on behalf of Plaintiff and the proposed Class, appointing Plaintiff as class representatives, and appointing their counsel to represent the Class;

B. Awarding declaratory and other equitable relief as necessary to protect the interests of Plaintiff and the Class;

C. Awarding injunctive relief as necessary to protect the interests of Plaintiff and the Class;

D. Awarding Plaintiff and the Class damages including applicable compensatory, exemplary, punitive damages, and statutory damages, as allowed by law;

E. Awarding restitution and damages to Plaintiff and the Class in an amount to be

determined at trial;

F. Awarding attorneys' fees and costs, as allowed by law;

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

I. Granting other relief that this Court finds appropriate.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all claims so triable.

Dated: September 2, 2025

By: *<u>/s/ Samuel J. Strauss</u>*

Samuel J. Strauss
STRAUSS BORRELLI PLLC
One Magnificent Mile
980 N Michigan Avenue, Suite 1610
Chicago IL, 60611
Telephone: (872) 263-1100
Facsimile: (872) 263-1109
sam@straussborrelli.com

Maureen M. Brady
MCSHANE & BRADY, LLC
4006 Central Street
Kansas City, MO 64111
Telephone: (816) 888-8010
Facsimile: (816) 332-6295
E-mail: mbrady@mcshanebradylaw.com

**Pro Hac Vice* Forthcoming

*Attorneys for Plaintiff and the Proposed Class*